529 So.2d 128 (1988)
Dr. Marise S. GOTTLIEB
v.
TULANE UNIVERSITY OF LOUISIANA, the Administrators of the Tulane Educational Fund, and Dr. John J. Walsh, Individually and as Chancellor of the Tulane Medical Center.
No. CA-8755.
Court of Appeal of Louisiana, Fourth Circuit.
July 12, 1988.
Writ Denied November 11, 1988.
*129 Mack E. Barham, Margaret E. Woodward, Gail N. Wise, Barham & Churchill, New Orleans, for plaintiff-appellant, Dr. Marise S. Gottlieb.
David L. McComb, James A. Babst, Kevin L. O'Dea, Julie D. Livaudais, Chaffe, McCall, Phillips, Tolar & Sarpy, New Orleans, for defendants-appellees, Tulane University of Louisiana, the Administrators of the Tulane Educational Fund, and Dr. John J. Walsh.
Before SCHOTT, KLEES and WILLIAMS, JJ.
KLEES, Judge.
Plaintiff, Dr. Marise S. Gottlieb, brought an action for breach of contract against defendants, Tulane University, the Administrators of the Tulane Educational Fund and Dr. John J. Walsh, Chancellor of the Tulane Medical Center, alleging that Tulane failed to honor a promise concerning an award of tenure. After a jury trial, judgment was rendered in favor of Tulane. From that judgment, plaintiff appeals.
In 1974, plaintiff, an M.D. epidemiologist, held a tenure track position as assistant professor in the Department of Community Medicine at Rutgers University Medical School. In the Fall of 1974, plaintiff's husband, Dr. Arthur Gottlieb, accepted the position as chairman of the Department of Microbiology and Immunology at the Tulane University School of Medicine. Shortly before plaintiff's husband accepted his new department chairmanship, plaintiff came to New Orleans and began discussions with Tulane concerning employment opportunities for herself. She met with Dr. Dorothy Clemmer of the School of Public Health and Dr. Hans Weill of the Pulmonary Disease Section of the School of Medicine.[1] At the time, plaintiff was seeking a full-time faculty position which included teaching and research duties. In November, 1974, after plaintiff's interview with Dr. Weill and Dr. Clemmer, and after Dr. Arthur Gottlieb accepted his new position at Tulane, Chancellor Walsh advised Dr. Arthur Gottlieb that he did not see any problem in recommending plaintiff for an appointment in the School of Public Health with additional duties in the Pulmonary Disease Section of the School of Medicine and the Louisiana State Department of Health. Plaintiff again visited Tulane in January, 1975 and personally met Chancellor Walsh and faculty members of the School of Public Health. She had no further discussions with Dr. Walsh after that meeting until after she arrived at Tulane in mid-summer of 1975. Plaintiff accepted a full-time dual appointment as an associate professor in the School of Medicine and the School of Public Health in February, 1975. Along with this dual appointment, plaintiff *130 was granted time allowances for work at the Louisiana Department of Health and the Louisiana Tumor Registry.
In late February 1975, while Dr. Arthur Gottlieb was making new faculty appointments for his department, he learned that Tulane Medical Center used "special" appointments for all faculty members other than department chairs and deans. A "special" appointment, as opposed to a "regular" appointment, was one that did not give tenure nor lead to tenure. After learning of this, Dr. Arthur Gottlieb called plaintiff in New Jersey and told her there was a problem with her recent dual appointment. Dr. Arthur Gottlieb then met with Chancellor Walsh to relate plaintiff's concerns about her appointment to him. Chancellor Walsh explained to Dr. Arthur Gottlieb that the use of the "special" appointment was an administrative device which Tulane began using in 1971 to avoid the commitment of university funds, the availability of which Tulane was uncertain. He advised Dr. Arthur Gottlieb that all faculty appointments in the Tulane Medical Center, with the exception of deans and department chairmen, were deemed "special" ones. Chancellor Walsh also told plaintiff's husband that in the future, all special appointments would be considered for conversion to regular appointments and that he anticipated plaintiff would proceed successfully through the review process and be converted to a regular appointment. Plaintiff claims and Tulane denies, that at this meeting in February, 1975, Chancellor Walsh also promised Dr. Arthur Gottlieb that his wife would have automatic tenure in four years. This alleged promise is the basis of this suit.
Although plaintiff accepted the dual appointment in February, 1975 and began teaching August 1, 1975, she did not receive a letter confirming her special appointment until October, 1975. Included with the confirmation letter was the Tulane University Senate Statement on Faculty Membership, Tenure, Retirement, Freedoms and Responsibilities.
In 1977, in response to a Tulane University Senate directive, the Medical Center began reviewing all special appointments to determine the propriety of converting them to regular appointments. While there exists controversy between the parties as to whether plaintiff's primary appointment was in the School of Medicine or in the School of Public Health, the fact is she was never converted to a regular appointment by either school. In June 1979, the faculty of the School of Public Health unanimously recommended that plaintiff be given a one-year terminal appointment for the academic year 1979-80. After completing her 1979 terminal appointment at the School of Public Health and her 1979 part-time appointment at the School of Medicine, the School of Medicine notified plaintiff that it converted her from Associate Professor to a newly created non-tenured position of Research Professor. This suit followed.
After a trial on the merits, the jury answered two special interrogatories in delivering its verdict. To the first, "Did Dr. Marise S. Gottlieb have a contract for tenure with Tulane University?", the jury answered yes. To the second, "Did Tulane breach its contract for tenure with Dr. Marise S. Gottlieb?", the jury answered no. In response to what plaintiff believed to be inconsistent answers to jury interrogatories, she filed a Motion for Judgment Notwithstanding a Verdict, which the trial judge subsequently denied. The trial judge then, in accordance with the jury's verdict, rendered judgment in favor of Tulane. Plaintiff appeals. We agree with the trial court's judgment dismissing Tulane University.
On appeal, plaintiff argues that in light of the jury's finding that a contract for tenure existed between plaintiff and Tulane, the jury's negative answer to the second interrogatory is clearly erroneous. Plaintiff argues the evidence does not support the jury's finding that the contract for tenure was not breached. Plaintiff offers as evidence to support her contention that the contract for tenure was breached, the undisputed fact that she was neither awarded tenure nor converted to a tenure track appointment.
*131 At trial in the instant matter, the trial judge correctly stated, "The total issue is whether or not this woman was hired by Tulane with a promise of tenure." Plaintiff's claim that she has a contract for tenure is based solely on an alleged promise made by Chancellor Walsh to Dr. Arthur Gottlieb at a meeting in February, 1975 in which Chancellor Walsh unconditionally guaranteed Dr. Arthur Gottlieb that plaintiff would have tenure in four years. Plaintiff contends Chancellor Walsh, the highest ranking administrator at Tulane Medical Center, possessed the apparent authority to make such a promise and that she reasonably relied on his promise when she accepted her appointment at Tulane Medical Center in 1975.
The doctrine of apparent authority is a judicially created concept of estoppel which operates in favor of a third party seeking to bind a principal for the unauthorized act of an apparent agent. Broadway v. All-Star Insurance Corp., 285 So.2d 536 (La.1973). As the Louisiana Supreme Court has previously held, the principal will be bound for the agent's actions if the principal has given an innocent third party a reasonable belief the agent had the authority to act for the principal. Further, a third party seeking to benefit from the doctrine of apparent authority may not blindly rely upon the assertions of an agent. He has a duty to inquire into the nature and extent of the agent's power. Boulos v. Morrison, 503 So.2d 1 (La.1987). It is also well settled that a third party may rely on the apparent authority of an agent only until an event occurs that would cause a reasonable person to inquire further into the circumstances. Radiofone v. Oxford Building Services, 347 So.2d 327 (La.App. 4th Cir.1977).
After a review of the trial transcript and examination of all the evidence, we conclude that plaintiff's reliance on a promise made by Chancellor Walsh was not reasonable and therefore, plaintiff did not have a guaranteed contract for tenure. Both plaintiff and her husband have been in academia for many years. They were very familiar with the way the tenure system worked in higher education. Dr. Arthur Gottlieb, as Chairman of the Department of Microbiology and Immunology, was involved in the recruitment of faculty for his department at the time this alleged promise was made. He was informed that due to budgetary constraints, all faculty appointments, with the exception of department chairs and deans, were to be special appointments. He was on notice that this would affect plaintiff's appointment as well. By his own admission, Dr. Arthur Gottlieb stated he was struck by Chancellor Walsh's sudden reference to tenure and that it raised a question in his mind as to how could Chancellor Walsh be so certain as to tenure because he was well aware that tenure decisions were a faculty prerogative.
Plaintiff herself acknowledged that her appointment would likely be conditioned on university money. In a letter written February 3, 1975 by plaintiff to Chancellor Walsh while she was searching for a suitable appointment, plaintiff declared, "While the most desirable position, from my point of view, would be a full-time faculty appointment as an M.D.epidemiologist, I am not unaware of the practical considerations regarding funding for such a position." Plaintiff also testified at trial that, "It was well known Tulane had financial problems."
Likewise, the record in this matter is replete with evidence that plaintiff knew her appointment was not a permanent regular appointment nor one which guaranteed tenure without her having to go through designated procedures. Plaintiff's confirmation letter from the School of Medicine dated October 10, 1975 stated that her appointment was a "special" appointment and specifically referred to the provisions of the Tulane University Faculty Handbook governing appointments and tenure. The "Statement on Academic Freedom, Tenure and Responsibilities" included in the Faculty Handbook expressly provided that:
"Faculty status including appointments, reappointments, decisions not to reappoint, promotions, the granting of tenure, discipline and dismissal, is primarily *132 a faculty responsiblity.... Determinations in matters of faculty status should first be by faculty action through established procedures with subsequent review by the Dean, the appropriate School or College and other academic officers as designated by the President of the University with the Concurrence of the Board of Administrators." [Emphasis Ours].
On April 21, 1976, plaintiff received a confirmation letter from the School of Public Health. This letter also stated her appointment was a "special" appointment and that employment beyond one year was dependent on "supportive funds, institutional and program needs and satisfactory performances." Plaintiff's five subsequent reappointment letters for the following three years from both the School of Medicine and the School of Public Health state that her appointment was a "special" one and dependent on these same conditions. Also introduced as evidence at trial were five Recommendation for Faculty Personnel Action forms from the Schools of Medicine and Public Health. These forms were internal documents which were initiated when faculty members were appointed, promoted, terminated, given tenure or when salary changes were made. All five identify plaintiff as a "special" appointee and state "the continuation of this special appointment beyond the period specified is based upon institutional and program needs and/or renewal of grant support and satisfactory performance." When asked at trial if she was concerned about the use of the term "special", plaintiff stated, "I was becoming concerned. Again I was relying on the special promises that were made to me prior to coming down to Tulane." Yet plaintiff also testified that when Dr. Arthur Gottlieb informed her of the special appointment procedure being utilized by Tulane in hiring new faculty, she told him she was "willing to take my risks along with everyone else; you can't appoint people under one department under certain circumstances and allow your wife to be considered in a special way."
Plaintiff argues that the term "special" appointment used in her case was not the "special" appointment contemplated by the Tulane Faculty Handbook. Plaintiff claims her appointment did not satisfy the Faculty Handbook definition of "special" appointment.[2] The Faculty Handbook definition of "special" appointment is in clear explicit language. Likewise, plaintiff's initial confirmation letters and subsequent reappointment letters specifically state that her appointment was a "special" appointment. Having accepted the subsequent special appointments on an annual basis, we can only presume that plaintiff knew the definition of special appointment. The fact that plaintiff's duties may not fit exactly within the definition of "special" appointment does not operate to prevent Tulane University from classifying her appointment as a special one. Tetlow v. Loyola University of New Orleans, 483 So.2d 1242 (La.App. 4th Cir.), writ denied, 488 So.2d 689 (La.1986).
In explaining to the jury its duty to make a determination of whether a contract for tenure existed between plaintiff and Tulane, the trial judge properly stated in its charge:
If you should find that a contract existed, the terms of the Tulane University Faculty Handbook, which set forth the University's employment policies, rules and regulations, govern the employment contract between the parties. This Handbook is the law between the parties *133 if the agreement is silent or ambiguous on any particular provision.
In light of this charge and the evidence presented at trial, it is reasonable to conclude that the jury found that a contract of employment existed between the parties and that this contract, subject to the terms of plaintiff's appointment and the Faculty Handbook, could lead to a possible conversion to a regular appointment, and eventually, consideration for tenure by the Tulane faculty. We are not persuaded by plaintiff's argument that the jury's finding that a "contract for tenure" existed between the parties could only mean that plaintiff had an unqualified promise of tenure within four years.
The standard of appellate review of a trial court's finding of fact is set forth in Arceneaux v. Domingue, 365 So.2d 1330 (La.1978) and Canter v. Koehring Co., 283 So.2d 716 (La.1973). Where there is credible evidence before the trier of fact, which furnishes a reasonable factual basis for the trial court's conclusion, an appellate court should not reverse unless the trial court is clearly wrong. Factual conclusions of the trial court are entitled to great weight since the trial court is in a better position to evaluate the credibility of witnesses, and an appellate court should not disturb those conclusions unless clearly and manifestly erroneous. Kendrick v. Kendrick, 236 La. 34, 106 So.2d 707 (1958); Orlando v. Polito, 228 La. 846, 84 So.2d 433 (1955); Guin v. Commercial Casualty Ins. Co., 224 La. 44, 68 So.2d 752 (1953). We find there was a reasonable factual basis for the ultimate result reached by the jury in this case.
Accordingly, the judgment in favor of Tulane University is affirmed.
AFFIRMED
NOTES
[1] Together, the School of Medicine and the School of Public Health and Tropical Medicine make up the Tulane University Medical Center.
[2] Article II, section 4 of the Statement on Academic Freedom, Tenure, and Responsibilities contained in the 1974 Tulane Faculty Handbook provided that there are two types of faculty appointments: "special" and "regular." Section 5 provided:

A special appointment neither gives tenure nor is to be regarded as a probationary appointment that may lead to tenure. The following are examples of special appointments:
A prearranged restricted term of service-(a) an appointment as a visiting professor, (b) an appointment for a summer session only, (c) an appointment for a special project, (d) an appointment for a definite time limit, and (e) an appointment concerned with a project for which continued financial and salary support is not assured.